688 S.E.2d 838

**The STATE, Petitioner,**

v.

**Kenneth NAVY, Jr., Respondent.**

**No. 26759.**

Supreme Court of South Carolina.

Heard April 22, 2009.

Decided Jan. 11, 2010.

Rehearing Denied March 2, 2010.

---

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Norman Mark Rapoport, Assistant Attorney General Michelle J. Parsons, and Warren Blair Giese, all of Columbia, for Petitioner.

Acting Chief Appellate Defender Robert M. Dudek, of Columbia, for Respondent.

Justice PLEICONES.

Respondent was convicted of homicide by child abuse in the suffocation death of his almost two year old son and received a twenty year sentence. On appeal, the Court of Appeals reversed, holding "the trial court erred in admitting [respondent's] voluntary oral statement and the second and third written statements." *State v. Navy,* 370 S.C. 398, 635 S.E.2d 549 (Ct.App.2006). We granted the State's petition for certiorari, and now affirm the decision to the extent it holds the second and third written statements are inadmissible under *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), but reverse the holding that the first oral statement was erroneously admitted.

## FACTS

At approximately 4 pm on Sunday, February 9, 2003, EMS responded to a 911 call placed from a residence. When they

arrived, respondent was administering CPR to his son. The child had no heartbeat or respiration, and attempts to resuscitate him in the ambulance and at the hospital were unsuccessful. The child was pronounced dead at 4:58 pm.

An autopsy was performed on Monday. The doctor testified there was no medical reason for the child to die, and opined that the death was the result of suffocation. He also found that the child had four older healing rib fractures in his back, fractures which had occurred at different times.

Respondent gave a statement at the hospital on Sunday night, but because he was so upset and distraught it was thought to be incomplete. On Wednesday morning, Sgt. Weeks and Investigator Smith went to respondent's residence with the intent of taking him from the home to the sheriff's office to interview him and obtain another statement. The decision to talk with respondent was prompted by a meeting with the autopsy doctor the day before who told the officers that the only way the child could have died was by smothering or suffocation.

When the officers arrived at the home, they told respondent they needed to ask some additional questions. Respondent was very cooperative, stating he wanted answers too, but he was upset and crying at the home and remained upset and crying throughout the entire time period from the time the officers arrived at the home (approximately 9 am) until they obtained the third statement (1 pm). The officers knew that the child's funeral home visitation was scheduled for later that Wednesday, and told respondent and his family that they would have respondent back in time for the service.

Respondent's first statement was given at the station at 9:50 am. In this oral statement, respondent maintained that he was watching TV on the first floor while the two younger children (the victim and a four year old daughter) napped upstairs. He told the officers:

1) The victim awoke crying as if from a nightmare;

2) Respondent comforted him, putting him back in the crib, and patting him on his back;

3) Respondent went downstairs to get a bottle: upon returning upstairs he noticed the child was having breathing problems; [1]

4) Respondent "panicked" and went up and down stairs several times until he "figured out" what was going on and returned upstairs bringing with him his friend Terry who was visiting;

5) He picked the "lifeless" child up, and told Terry to take the other child downstairs and keep her from seeing what was going on;

6) Respondent took the lifeless child downstairs, put him on the floor, and performed CPR three times [2] before calling 911;

7) Respondent continued CPR until EMS arrived.

This statement is largely consistent with the statement respondent gave at the hospital after the child died.

At the Sheriff's Department respondent was given cigarettes and permitted to take escorted smoking breaks. The investigator testified respondent was not in custody or under arrest, and agreed that respondent was free to tell the officers to take him home anytime he wanted.

After he gave this first statement, the crying and upset respondent was informed, for the first time, that the child had been suffocated and that there was evidence of broken ribs. According to Investigator Smith, respondent was shocked and surprised by this information. Respondent asked if he were under arrest, and was told "No, we are just trying to get some answers." The officers engaged in follow-up questioning, asking specifically how respondent had comforted the crying child. At this juncture, the nature of the interrogation and respondent's status changed, and what had begun as a voluntary question and answer session matured into custodial interrogation. In response to these follow-up questions, respondent told the officers he had "popped" the child on the back

---

1. The child, who was born prematurely, had lung issues and was being weaned off a nebulizer and Albuterol. The mother was primarily involved in the child's medical treatments.

2. There was evidence that a child should be placed on a hard surface such as a floor when CPR is to be administered.

rather than simply patted him, and that he may have "patted" the child on its mouth to stop the crying.

After eliciting the answers in which respondent admitting hitting the child and interfering with the child's breathing, the officers allowed him another smoke break. Investigator Smith insisted at trial that respondent was still free to leave, but also testified that he "perceived that the line of questioning may move further into what he had just told us." Smith decided it was now appropriate to give respondent *Miranda* warnings and administered them to respondent at 11:35 am.

Following the *Miranda* warnings, respondent gave his second statement, this one in writing, at 11:40 am. Significantly, in this second statement, respondent described the events as "the same as in his first statement," except that:

1) He could not get the child to be quiet, and while the crying child was sitting up in the crib, respondent put his hand over the child's mouth, but did not hold it there.

2) Respondent then laid the child on his stomach in the crib and "popped" him in the middle of the back, causing the child to cry "one time real loud." Respondent then put his hand over the child's mouth again to try to stop the crying, then noticed the child could not get his breath, perhaps as the result of the pop on the back.

3) Respondent, thinking he had knocked the child's breath out, went downstairs and returned with a bottle.

4) The child was still "making that noise" "like he was still trying to catch his breath" and respondent panicked. As the child quit and then resumed breathing, respondent went downstairs and got Terry.

5) When respondent and Terry got back upstairs, the child was not breathing.

6) In response to the question: "When you placed your hand over [the child's] mouth, is it possible that your hand covered his nose area as well," respondent answered "It could have been."

Q. When you popped him in the back, did you have your fist balled up?

A. No sir. It was my flat hand.

Q. How hard did you pop him?

A. Not like trying to kill him or nothing. I just popped him.

. . .

Q. Why did you pop [him] in the back Sunday?

A. I was frustrated because he was crying.

Following this second statement, which was reduced to writing, Sgt. Weeks contacted the pathologist who had conducted the autopsy to ask whether the actions respondent admitted committing in his second statement "could have caused" the child's death. The pathologist said no, and told the officer that the hand would have had to cover the child's nose and mouth for at least a minute. The officers then obtained a third written statement from respondent at 12:25 pm. The brief questions and answers are:

Q. [Respondent], is it possible that you held your hand over [the child's] mouth and nose for a longer period of time then you first related to us that you did?

A. Yeah, it could have been longer.

Q. How long do you think it could have been?

A. I don't know.

Q. Can you give us any idea at all how long you might have held your hand over his nose and mouth?

A. A minute, not more than two minutes.

Q. When you removed your hand the last time was [the child] breathing?

A. He was gasping for breath.

Respondent moved to suppress all three statements, but particularly the written second and third statements. He argued that the statements were not voluntary, in that he was distraught, sleep-deprived, and shocked by the information that his child had been suffocated and had rib injuries. Specifically, respondent argued that the second and third statements were unconstitutionally obtained since the officers conducted unwarned custodial interrogation after he gave the first oral statement, obtained incriminating evidence, and only then *Mirandized* him and took the official second and third statements.

The trial court admitted all three statements, finding that respondent was not in custody, was not significantly deprived of his freedom, and that the first statement was voluntary and no *Miranda* warning rights were required. As to the second and third statements, he made the finding the statements were *Mirandized* and freely and voluntarily given. On appeal, the Court of Appeals reversed, finding none of the three statements should have been admitted.

## ISSUE

Whether the Court of Appeals erred in reversing the trial court's decision to admit respondent's three statements?

## ANALYSIS

### A. First Statement

■ On appeal, the Court of Appeals, citing *State v. Evans*, 354 S.C. 579, 582 S.E.2d 407 (2003), held the first statement should have been suppressed primarily because respondent was in custody at the time of the statement. The State contends the Court of Appeals erred in reaching this result. We agree with the State that the Court of Appeals erred in reversing the trial judge's ruling admitting respondent's oral statement.

■ Whether a suspect is in custody is determined by an examination of the totality of the circumstances, such as the location, purpose, and length of interrogation, and whether the suspect was free to leave the place of questioning. It is an objective determination, that is, would a reasonable person have believed he was in custody. *State v. Evans, supra.* On appeal, the trial court's findings as to custody must be upheld where they are supported by the record. *Id.*

In our opinion, it is debatable whether a reasonable person would have believed himself to be in custody at the time the first statement was given, and thus the trial court's finding that respondent was not in custody should have been upheld as it is supported by the record. *State v. Evans, supra.* In light of this, the Court of Appeals erred in finding the first statement should have been suppressed.

*B.  Second and Third Statements*

■ The Court of Appeals held that respondent's second and third statements should have been suppressed because they were obtained in violation of the rule announced in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).[3]  We agree.

In *Seibert*, the Court dealt with the police practice of questioning a suspect until incriminating information is elicited, then administering *Miranda* warnings.  Following the warnings, the suspect is again questioned and the incriminating information re-elicited.  The post-warning statement is then sought to be admitted.  The factors to be considered in determining whether a constitutional violation occurred in this setting, according to the *Seibert* plurality opinion, are:

1) the completeness and detail of the question and answers in the first round of interrogation;

2) the timing and setting of the first questioning and the second;

3) the continuity of police personnel;  and

4) the degree to which the interrogator's questions treated the second round as continuous with the first.

Justice Kennedy wrote separately, stating that while he agreed with much of the plurality opinion, he wished to emphasize that not every *Miranda* violation would require suppression.  He explained that an exception should be made where the officer may not have realized that a suspect is in custody and therefore a warning was required, or where the officer did not plan to question the suspect at that juncture.  Justice Kennedy noted that in *Seibert*, the two-step technique was used to deliberately avoid *Miranda*, using a strategy based on the assumption that *Miranda* warnings will mean less when given after an incriminating statement has already been made.  Under these circumstances, Justice Kennedy agreed the statements must be suppressed unless "curative measures" were taken.  As examples of curative actions, Justice Kennedy suggested a substantial break in time and circumstances between the pre-warning statement and the

---

**3.**  *Seibert* was filed eight days after respondent's trial ended.

warned, or an additional warning before questioning resumes that the pre-warned statement is not admissible.

In our opinion, the Court of Appeals correctly concluded the officers' actions here violated *Seibert* and therefore the second and third written statements must be suppressed. The officers began the questioning of respondent with knowledge that the child had been suffocated and with the intention of eliciting a confession. After respondent's first oral statement, the officers "sprang" the suffocation/healing rib fractures information on respondent, and began an unwarned custodial interrogation designed to elicit incriminating information, that is, questioning designed to have respondent admit to having hit the child and to having smothered him. Once those incriminating answers were given—i.e. after respondent admitted he had popped the child on the back and "patted" his mouth—respondent was permitted a supervised cigarette break, then given *Miranda* warnings, with interrogation by the same officer resuming immediately. Thus the four elements outlined in *Seibert* were met here. Moreover, none of the curative measures suggested by Justice Kennedy, i.e. an additional warning that the answers given after the first statement but before the administration of *Miranda* warnings may not be admissible,[4] a substantial break in time, or change of circumstances, occurred here.

The State would characterize the failure to initially administer warnings was merely one of "good faith," relying on *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In *Elstad,* the officer asked a few questions of the suspect at the suspect's home before transporting him to the police station for questioning. Here, in contrast, the officers questioned respondent at headquarters for almost three hours before giving the warning. Moreover, after the first round of detailed questioning resulted in the first statement, respondent was confronted with the autopsy results which stated that the cause of death was suffocation, and that there was evidence of old bone breaks, followed by more detailed questioning. In our opinion, the Court of Appeals correctly held

---

4. The dissent focuses on the fact the first statement was admissible, while our focus is on the police actions and interrogation after that statement had been given.

that the rule in *Seibert* applies here to bar admission of the second and third statements.

The State also argues that this case differs from *Seibert* in that there was evidence in *Seibert* of a deliberate police practice, the "question first" strategy. In our view, that deliberate practice was not determinative in *Seibert*. Moreover, since *Seibert* had not been decided before respondent's trial, it is not surprising that defense counsel did not specifically question Investigator Smith whether he was using this strategy. Finally, the *Seibert* Court acknowledged that it was unlikely that law enforcement would admit it was using the "question first" technique, and thus evidence that officers were following this protocol was not necessary in order for a *Miranda* violation to be found. *Seibert* at footnote 6.

## CONCLUSION

We affirm the Court of Appeals' decision to the extent it held that the second and third statements should have been suppressed, but reverse the decision holding that the first statement was unlawfully obtained.

**AFFIRMED IN PART; REVERSED IN PART.**

WALLER, J., and Acting Justice JAMES R. BARBER, III, concur. TOAL, C.J., dissenting in a separate opinion in which KITTREDGE, J., concurs except for the finding that the third statement was obtained in a non-custodial setting.

Chief Justice TOAL.

I respectfully dissent from Part B of the majority opinion, and would reverse the court of appeals' decision finding the second and third written statements were inadmissible.

In *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the United States Supreme Court addressed the police practice of conducting a custodial interrogation in which no *Miranda* warnings were given until the interrogation produced a confession. *Seibert*, 542 U.S. at 604, 124 S.Ct. 2601. The interrogating officers would follow the inadmissible statement with *Miranda* warnings, and then lead the suspect over the same ground a second time. *Id.* The Court concluded, "Because this midstream recitation of warn-

ings after interrogation and unwarned confession could not effectively comply with *Miranda's* constitutional requirement, we hold that a statement repeated after a warning in such circumstances is inadmissible." *Id.* The *Seibert* Court elaborated:

> For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda,* or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Id.* at 612. In describing why the *Miranda* warnings were ineffective in *Seibert,* the Court stated, "[T]he police did not advise that her prior statement could not be used." *Id.* at 616. Thus, for *Seibert* to apply, the first unwarned custodial statement must be inadmissible. This is in part because the Court was concerned that the later interrogation was a mere continuation of the earlier unwarned and inadmissible custodial interrogation. *See id.* at 616–17.

In this matter, the majority's reliance on *Seibert* is misplaced. *Seibert* applies when police conduct an initial custodial interrogation without giving *Miranda* warnings, elicit a confession, and then give *Miranda* warnings before finally eliciting the same confession a second time. *See id.* at 604. In such circumstances, the first unwarned statement is inadmissible because it violates *Miranda's* warning requirements. *See id.*

In the present case, I agree with the majority that the first statement was admissible because Respondent was not in custody when it was given. Because there was no custodial interrogation regarding the first statement, there was no need for *Miranda* warnings. The majority states that the interrogation status changed from noncustodial to custodial when the police asked Respondent how he comforted the child. However, merely asking questions that result in inculpatory responses does not change a noncustodial interrogation into a custodial interrogation. If this were so, the nature of police investigation would be forever altered. There is no evidence in the record to suggest the circumstances of questioning changed such that a custodial interrogation resulted

when the police began to elicit inculpatory information. Hence, because there was no custodial interrogation, *Seibert* does not apply.

The mere giving of *Miranda* warnings does not convert an otherwise noncustodial situation into a custodial interrogation. *State v. Doby*, 273 S.C. 704, 708, 258 S.E.2d 896, 899 (1979). In this case, the second and third statements were obtained after *Miranda* warnings were given. However, giving *Miranda* warnings did not convert the noncustodial interrogation into a custodial interrogation. Because the second and third statements were obtained in a noncustodial setting, I would hold the second and third statements were admissible. Thus, I would reverse the court of appeals' decision and hold the trial court correctly allowed all three statements.

KITTREDGE, J., concurs except for the finding that the third statement was obtained in a non-custodial setting.