747 S.E.2d 194

The STATE, Respondent,

v.

Lance WILLIAMS, Appellant.

Appellate Case No. 2011–189886.
No. 5161.

Court of Appeals of South Carolina.

Heard June 6, 2013.
Decided July 24, 2013.

Richard A. Harpootlian, M. David Scott, and Graham L. Newman, all of Richard A. Harpootlian, PA, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Harold M. Coombs, Jr., and Assistant Attorney General John Benjamin Aplin, all of Columbia; Solicitor Donald V. Myers, of Lexington, for Respondent.

KONDUROS, J.

Lance Williams appeals his convictions of criminal sexual conduct (CSC) with a minor, first degree, and unlawful conduct towards a child. He argues the trial court erred in (1) admitting statements given in violation of *Miranda*[1]; (2) denying his motion for a directed verdict for the unlawful conduct towards a child charge; and (3) admitting enlarged anatomical diagrams and photographs of the victim. We affirm.

**FACTS**

On April 15, 2010, Williams cared for his girlfriend's fifteen-month-old daughter (Victim) for about ten hours. That evening, Victim's mother and other family members took her to the emergency room after they noticed bruises on her face, arms, and genital area. Detective Ed Prestigiacomo visited the hospital to investigate Victim's injuries the following day. He learned Williams had cared for Victim on the day her injuries were discovered. He contacted Williams and asked him to come to the Lexington County Sheriff's Department to talk to him. Williams told Detective Prestigiacomo he wanted to clear up the matter that night because he had a wedding to attend in Alabama the following day. Williams arrived at the

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Department that night around 7 p.m. with his mother and two-year-old daughter.

Detective Prestigiacomo escorted Williams to an interview room while his mother and daughter stayed in the lobby. The door to the interview room was locked to people entering the room but a person could exit the room without a key or code.[2] Detective Palkowski joined them in the interview room after Detective Prestigiacomo had gotten some background information from Williams. Detective Prestigiacomo informed Williams Victim had bruises all over her body, and Williams said she had fallen. Detective Prestigiacomo showed Williams pictures of Victim's arms, which had circular bruises on them that Detective Prestigiacomo believed to be finger marks from someone holding her too tightly. Williams told Detective Prestigiacomo he sometimes picks his daughter up like that and his mother has told him he should not pick up a child like that. He informed the detectives a shard of glass had gone into his hand when he was in school and the injury caused his hand to be numb because of the severed nerves. Williams indicated that as a result of the injury, sometimes he is heavy handed. Williams offered to shake Detective Prestigiacomo's hand to demonstrate his grip, and Detective Prestigiacomo allowed him to do that.

Detective Prestigiacomo next showed Williams pictures of Victim's ears, revealing bruising on and behind the ears, which Detective Prestigiacomo testified is common when a person is slapped or punched in the ear. Williams stated Victim had misbehaved and the injuries occurred when he disciplined her during those two occurrences. Williams said Victim had a temper tantrum and was throwing her toys and he slapped her twice on one ear. Later, she threw her bottle down and he slapped her on the other ear twice. He said he did it for discipline and demonstrated on himself to show how he could not tell his own strength. Williams also punched the desk at some point during the interview to demonstrate how he could not feel his hand.

---

2. Detective Prestigiacomo provided this in his testimony at trial, but during the *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), hearing, he had testified the door was locked and Williams did not have a key or the combination to open it.

Detective Prestigiacomo showed Williams the third picture, which was her forehead that had several circular bruises, and another of the outside of her vagina, which was bruised. Williams stated Victim had injured her head by falling and he had to put eczema cream on her vagina and did not realize how hard he was pressing. He told Detective Prestigiacomo he was angry about having to clean her and demonstrated how much force he had used. Detective Prestigiacomo then stopped the interrogation and advised Williams of his *Miranda* rights.[3] Williams waived those rights and wrote a formal statement repeating the explanations given for Victim's injuries. In response to direct written questions by Detective Prestigiacomo, Williams added he had injured Victim's vagina while cleaning her during a diaper change because he was angry. He also wrote that he had an anger problem. Williams was arrested for physical assault and sexual assault or assault against sexual organs. A grand jury indicted him for CSC with a minor, first degree, and unlawful conduct towards a child.

At the start of the trial, the court held a *Jackson v. Denno* hearing. Detective Prestigiacomo testified about the evening Williams came to the Department. He provided that Williams was the primary suspect but Victim's mother and her roommate were also suspects. He testified Williams was not in custody during his interview before he was advised of his *Miranda* rights. Detective Prestigiacomo testified Williams was free to leave at the beginning of the interview until he gave the incriminating statements and at that point Detective Prestigiacomo administered the *Miranda* warnings.

The trial court first analyzed the oral statement and looked at *State v. Evans,* 354 S.C. 579, 582 S.E.2d 407 (2003), and *State v. Navy,* 386 S.C. 294, 688 S.E.2d 838 (2010). It noted that it was to look at the totality of the circumstances from an objective standard. The trial court determined that based on "the method of arrival, the voluntary arrival, the agreement to participate, the accidental explanations, [and] the officer's testimony that the Defendant was free to leave," the oral statement was admissible because Williams was not in custody

---

3. This occurred approximately fifteen to twenty minutes after they had started speaking about Victim's injuries.

and therefore *Miranda* warnings were not required. The court noted it was making that decision based on an objective standard and not just the officer's subjective testimony that Williams was free to leave. The trial court found that "a reasonable person arriving voluntarily in a private vehicle, never requests any help, not under the influence, cooperating with the officers, wanting to clear it up, that a reasonable person would believe they were free to leave." The trial court further found once Detective Prestigiacomo decided to place Williams under arrest, he was appropriately advised of his *Miranda* rights. Thus, the written statement was admissible.[4]

During the testimony of Marlena Clary, a forensic nurse examiner, the State sought to admit enlarged copies of a report, including anatomical diagrams (State's Exhibits 9, 10 and 11). Williams objected, and the trial court overruled the objection, instructing the jury the fact that it was enlarged should not enhance or disenhance the evidence or testimony. Later, the State sought to introduce photographs into evidence (State's Exhibits 12, 13, 14, and 15). Williams stated he had no objection, and the trial court admitted the photographs into evidence.

Dr. Susan Breeland Luberoff was qualified as an expert in child abuse pediatrics and testified. During her testimony, the State sought to introduce photographs Dr. Luberoff had taken during her examination of Victim (State's Exhibits 16, 17, 18, 19, and 20). Williams stated he had no objection to the photographs.

At the close of the State's case, Williams moved for a directed verdict on the count of unlawful conduct towards a child. He argued he was not a person responsible for Victim's welfare because he was not the parent of Victim. The trial court denied the motion, finding the State presented evidence he was an adult who assumed the role or responsibility of a parent or guardian for a child, in that he stayed at the house overnight with Victim's mother a majority of the time and interacted with Victim. The court found he had more than incidental contact.

---

4. Williams later testified on his own behalf and repeated the explanations he had given during his questioning by the officers.

The jury convicted Williams of both counts. The trial court sentenced him to twenty-five years' imprisonment for CSC and ten years' imprisonment for unlawful conduct towards a child, to run concurrently. This appeal followed.

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus,* 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). Thus, an appellate court is bound by the trial court's factual findings unless they are clearly erroneous. *Id.*

## LAW/ANALYSIS

### I. *Miranda* Rights

Williams argues the trial court erred in admitting statements he gave before and after he was advised of his *Miranda* rights because he was in custody at the time he gave the statements. We disagree.

"The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." *State v. Pagan,* 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *Id.; see also State v. Wise,* 359 S.C. 14, 21, 596 S.E.2d 475, 478 (2004) ("The admission or exclusion of evidence is a matter addressed to the sound discretion of the trial court and its ruling will not be disturbed in the absence of a manifest abuse of discretion accompanied by probable prejudice."). Our review of whether a person is in custody is confined to a determination of whether the ruling by the trial court is supported by the record. *State v. Evans,* 354 S.C. 579, 583, 582 S.E.2d 407, 409 (2003).

The State may not use statements stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Custodial interrogation entails questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Id.* Interrogation can be either express questioning or its functional equivalent and includes words or actions on the part of police (other than those normally attendant to arrest and custody) the police should know are reasonably likely to elicit an incriminating response. *State v. Kennedy,* 325 S.C. 295, 303, 479 S.E.2d 838, 842 (Ct.App.1996), *aff'd as modified,* 333 S.C. 426, 510 S.E.2d 714 (1998).

■■■■■ Whether a suspect was in "custody is determined by an objective analysis of 'whether a reasonable man in the suspect's position would have understood himself to be in custody.'" *State v. Ledford,* 351 S.C. 83, 88, 567 S.E.2d 904, 907 (Ct.App.2002) (quoting *State v. Easler,* 327 S.C. 121, 128, 489 S.E.2d 617, 621 (1997)). "To determine whether a suspect is in custody, the trial court must examine the totality of the circumstances, which include factors such as the place, purpose, and length of interrogation, as well as whether the suspect was free to leave the place of questioning." *Evans,* 354 S.C. at 583, 582 S.E.2d at 410. A person is "in custody" when a person's freedom has been restricted. *State v. Caulder,* 287 S.C. 507, 515, 339 S.E.2d 876, 881 (Ct.App.1986).

■■■■ To determine whether a suspect was in custody for the purposes of *Miranda,* the Supreme Court has asked whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Maryland v. Shatzer,* 559 U.S. 98, 112, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010). "The threat to a citizen's Fifth Amendment rights that *Miranda* was designed to neutralize has little to do with the strength of an interrogating officer's suspicions." *Stansbury v. California,* 511 U.S. 318, 324–25, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (internal quotation marks omitted). "[A]ny inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for purposes of *Miranda.*" *Id.* at 326, 114 S.Ct. 1526.

In [*Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) ], the Court dealt with the police practice of questioning a suspect until incriminating information is elicited, then administering *Miranda* warnings. Following the warnings, the suspect is again questioned and the

incriminating information re-elicited. The post-warning statement is then sought to be admitted. The factors to be considered in determining whether a constitutional violation occurred in this setting, according to the *Seibert* plurality opinion, are:

1) the completeness and detail of the question and answers in the first round of interrogation;

2) the timing and setting of the first questioning and the second;

3) the continuity of police personnel; and

4) the degree to which the interrogator's questions treated the second round as continuous with the first.

*State v. Navy*, 386 S.C. 294, 302, 688 S.E.2d 838, 841–42 (2010). In *Seibert,*

Justice Kennedy wrote separately, stating that while he agreed with much of the plurality opinion, he wished to emphasize that not every *Miranda* violation would require suppression. He explained that an exception should be made where the officer may not have realized that a suspect is in custody and therefore a warning was required, or where the officer did not plan to question the suspect at that juncture. Justice Kennedy noted that in *Seibert,* the two-step technique was used to deliberately avoid *Miranda,* using a strategy based on the assumption that *Miranda* warnings will mean less when given after an incriminating statement has already been made. Under these circumstances, Justice Kennedy agreed the statements must be suppressed unless "curative measures" were taken. As examples of curative actions, Justice Kennedy suggested a substantial break in time and circumstances between the pre-warning statement and the warned, or an additional warning before questioning resumes that the pre-warned statement is not admissible.

*Navy*, 386 S.C. at 302–03, 688 S.E.2d at 842. Our supreme court held the evidence of a deliberate police practice, the "question first" strategy, was not determinative in *Seibert*. *Navy*, 386 S.C. at 304, 688 S.E.2d at 842.

In *Navy*, the supreme court noted:

The officers began the questioning of [defendant] with knowledge that the child had been suffocated and with the

intention of eliciting a confession. After [defendant]'s first oral statement, the officers "sprang" the suffocation/healing rib fractures information on [defendant], and began an unwarned custodial interrogation designed to elicit incriminating information, that is, questioning designed to have [defendant] admit to having hit the child and to having smothered him. Once those incriminating answers were given—i.e. after [defendant] admitted he had popped the child on the back and "patted" his mouth—[defendant] was permitted a supervised cigarette break, then given *Miranda* warnings, with interrogation by the same officer resuming immediately. Thus the four elements outlined in *Seibert* were met here.

*Navy*, 386 S.C. at 303, 688 S.E.2d at 842.

■ Simply because an interview takes place at a law enforcement center and at the initiation of police investigators does not render it a "custodial interrogation." *State v. Doby*, 273 S.C. 704, 708, 258 S.E.2d 896, 899 (1979). Rather, the fact a defendant voluntarily agreed to accompany investigators to their office and answer questions without being placed under arrest indicates a non-custodial situation. *Id.* In *Navy*, the supreme court found it was debatable whether a reasonable person would have believed he was in custody at the time the first statement was given, and thus held the trial court's finding the defendant was not in custody should have been upheld as it was supported by the record. 386 S.C. at 301, 688 S.E.2d at 841.

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him in custody. It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (internal quotation marks omitted).

> The initial determination of whether an individual is in custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. Thus, a police officer's subjective view that the person being questioned is a suspect, if undisclosed, does not bear upon the question of whether that person is in custody, and the same is true where the officer's undisclosed assessment is that the person being questioned is not a suspect. However, an officer's knowledge or beliefs may bear upon the issue of whether the person being questioned is in custody if they are conveyed, by word or deed, to the person being questioned; those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the person being questioned would gauge the breadth of his or her freedom of action.

George L. Blum, Annotation, *What Constitutes "Custodial Interrogation" of Adult by Police Officer Within Rule of Miranda v. Arizona Requiring that Suspect Be Informed of Federal Constitutional Rights Before Custodial Interrogation—At Police Station or Sheriff's Office, Where Defendant Voluntarily Appears or Appears at Request of Law Enforcement Personnel, or Where Unspecified as to Circumstances Upon Which Defendant Is Present*, 29 A.L.R.6th 1, § 2 (2007).

In determining whether an interrogation was "custodial" within the meaning of the *Miranda* rule, courts have considered the following factors: (1) whether the contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to interview; (2) whether the express purpose of the interview was to question the person as a witness or suspect; (3) where the interview took place; (4) whether the police informed the person he or she was under arrest or in custody; (5) whether they informed the person he or she could terminate the interview and leave at any time or whether the person's conduct indicated an awareness of such freedom; (6) whether there were restrictions on the person's freedom of movement during the interview; (7) how long the interrogation lasted; (8) how many police officers participated; (9)

whether they dominated and controlled the course of the interrogation; (10) whether they manifested a belief that the person was culpable and they had the evidence to prove it; (11) whether the police were aggressive, confrontational, or accusatory; (12) whether the police used interrogation techniques to pressure the suspect; and (13) whether the person was arrested at the end of the interrogation. *Id.* at § 3.

Some courts have outlined several factors used to assess how a reasonable person in the defendant's situation would have understood the situation: (1) What was the location where the questioning took place, that is, was the defendant comfortable and in a place a person would normally feel free to leave, for example, at home as opposed to being in the more restrictive environment of a police station; (2) Was the defendant a suspect at the time the interview began, bearing in mind that *Miranda* warnings are not required simply because the investigation has focused; (3) Was the defendant's freedom to leave restricted in any way; (4) Was the defendant handcuffed or told he was under arrest; (5) Were threats ... made during the interrogation; (6) Was the defendant physically intimidated during the interrogation; (7) Did the police verbally dominate the interrogation; (8) What was the defendant's purpose for being at the place where questioning took place? For example, the defendant might be at a hospital for treatment instead of being brought to the location for questioning; (9) Were neutral parties present at any point during the questioning; (10) Did police take any action to overpower, trick, or coerce the defendant into making a statement?

*Id.*

The Court of Appeals of Georgia has noted:
Even if the police have probable cause to arrest at the time of the interview and secretly intend to charge the suspect at some future time, such facts are immaterial to a determination of whether the suspect was in custody at the time of the interview, except when and to what extent the police communicate their future intent to arrest during the course of the interview.

*Ray v. State,* 273 Ga.App. 656, 615 S.E.2d 812, 815–16 (2005).

In *Evans,* the interview lasted three hours and officers challenged the defendant on the answers she gave. 354 S.C.

at 581, 584, 582 S.E.2d at 409, 410. There, the trial court found the defendant to be in custody, and thus, the appellate court based its decision on whether any evidence supported that finding. *Id.* at 584, 582 S.E.2d at 410. In *Navy,* the court noted that the defendant was upset during the interview, which lasted three hours, and the police called into doubt his responses to their questions. 386 S.C. at 297, 303, 688 S.E.2d at 839, 842. Here, the record demonstrates Williams was not upset and the officers were not confrontational towards him.

Evidence supports the trial court's finding Williams was not in custody before he was given his *Miranda* warnings. He came to the Department voluntarily; his mother and young daughter were waiting for him; he wanted to get the matter taken care of before leaving the state for a wedding the following day; he talked with the detectives about Victim's injuries for fifteen to twenty minutes before he was given *Miranda* warnings; he never asked if he could leave or asked for anything; and the conversation leading to his incriminating statements included information about where he was from and his background. Therefore, evidence supports the trial court's finding Williams was not in custody and thus *Miranda* was not violated. Accordingly, we affirm the trial court's admission of Williams's statements.

## II. Directed Verdict

 Williams argues the trial court erred in denying his motion for a directed verdict on the unlawful conduct towards a child charge because he was not a person responsible for the child's welfare. We disagree.

 "When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." *State v. Weston,* 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). When reviewing a trial court's denial of a defendant's motion for a directed verdict, an appellate court must view the evidence in a light most favorable to the State. *State v. Venters,* 300 S.C. 260, 264, 387 S.E.2d 270, 272 (1990). Additionally, an appellate court must find a case is properly submitted to the jury if any direct evidence or any substantial circumstantial evidence reasonably

tends to prove the guilt of the accused. *Weston,* 367 S.C. at 292–93, 625 S.E.2d at 648.

> It is unlawful for a person who has charge or custody of a child, or who is the parent or guardian of a child, or who is responsible for the welfare of a child as defined in [s]ection 63–7–20 to:
>
> (1) place the child at unreasonable risk of harm affecting the child's life, physical or mental health, or safety;
>
> (2) do or cause to be done unlawfully or maliciously any bodily harm to the child so that the life or health of the child is endangered or likely to be endangered; or
>
> (3) wilfully abandon the child.

S.C.Code Ann. § 63–5–70(A) (2010).

Section 63–7–20(16) of the South Carolina Code (2010) provides:

> "Person responsible for a child's welfare" includes the child's parent, guardian, foster parent, an operator, employee, or caregiver, as defined by [s]ection 63–13–20, of a public or private residential home, institution, agency, or childcare facility or *an adult who has assumed the role or responsibility of a parent or guardian for the child, but who does not necessarily have legal custody of the child.* A person whose only role is as a caregiver and whose contact is only incidental with a child, such as a babysitter or a person who has only incidental contact but may not be a caretaker, has not assumed the role or responsibility of a parent or guardian.

(emphasis added).

The trial court did not err in denying Williams's motion for a directed verdict. Williams and Victim's mother had been dating for four months, and he stayed overnight with them between two and four nights a week. Williams and Victim's mother had discussed moving in together once Victim's mother finished school. She testified he wanted to be a stepfather to Victim. She would ask him to tell Victim to stop if she was doing something wrong. Williams would instruct Victim verbally but was not allowed to physically discipline her. He had changed Victim's diaper before and would watch her while her mother was cooking. He had also bathed her before with Victim's mother in the house. He had watched her before

with other adults or other children present. Williams's involvement in Victim's life was some evidence that he has assumed the role of a parent. Accordingly, the trial court did not err in denying the motion for the directed verdict. Therefore, we affirm the trial court's denial of the directed verdict motion.

## III. Admission of Photographs

Williams argues the trial court erred in admitting enlarged anatomical diagrams and photographs of the victim. We disagree.

To preserve an issue regarding the admissibility of evidence, a contemporaneous objection must be made. *State v. Wannamaker,* 346 S.C. 495, 499, 552 S.E.2d 284, 286 (2001). The failure to object to photographs at the time they are offered waives the right to object to them on appeal. *Ramos v. Hawley,* 316 S.C. 534, 536, 451 S.E.2d 27, 28 (Ct.App.1994). However, once the trial court has ruled on an objection, counsel does not need to object every time the issue arises. *Bennett v. State,* 383 S.C. 303, 308, 680 S.E.2d 273, 275 (2009) (stating because the trial court had already ruled on an issue, trial counsel did not need to renew objection); *see also* Rule 17, SCRCrimP ("If an objection has once been made at any stage to the admission of evidence, it shall not be necessary thereafter to reserve rights concerning the objectionable evidence.").

"The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." *Pagan,* 369 S.C. at 208, 631 S.E.2d at 265. "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *Id.* "[E]vidence should be excluded when its probative value is outweighed by its prejudicial effect." *State v. Kelley,* 319 S.C. 173, 177, 460 S.E.2d 368, 370 (1995). Demonstrative evidence includes items such as a photograph, chart, diagram, or video animation that explains or summarizes other evidence and testimony. Such evidence has secondary relevance to the issues at hand; it is not directly relevant, but must rely on other material testimony for relevance. Demonstrative evidence is distinguishable

from exhibits that comprise "real" or substantive evidence, such as the actual murder weapon or a written document containing allegedly defamatory statements.

*Clark v. Cantrell,* 339 S.C. 369, 383, 529 S.E.2d 528, 535 (2000). In *Kelley,* the court found the trial court did not abuse its discretion in admitting hand-drawn outlines of a victim's face and body, showing numerous wounds, because they corroborated the pathologist's testimony. 319 S.C. at 177, 460 S.E.2d at 370.

 "The relevance, materiality, and admissibility of photographs are matters within the sound discretion of the trial court and a ruling will be disturbed only upon a showing of an abuse of discretion." *State v. Martucci,* 380 S.C. 232, 249, 669 S.E.2d 598, 607 (Ct.App.2008). The trial court must balance the prejudicial effect of graphic photographs against their probative value, and that decision should be reversed only in exceptional circumstances. *Id.* at 249–50, 669 S.E.2d at 607. "Admitting photographs which serve to corroborate testimony is not an abuse of discretion. However, photographs calculated to arouse the sympathy or prejudice of the jury should be excluded if they are irrelevant or not necessary to substantiate material facts or conditions." *Id.* at 250, 669 S.E.2d at 607 (citations omitted). "To constitute unfair prejudice, the photographs must create a tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (internal quotation marks omitted). A trial court is not required to exclude relevant evidence simply because it is unpleasant or offensive. *Id.*

 Williams only objected to the admission of the anatomical diagram enlargements (State's Exhibits 9, 10, and 11). He did not object to the admission of any of the photographs.[5] He contends that any objection to the photographs was futile in light of the trial court's ruling on the diagrams. We disagree. The photographs and anatomical diagrams are not the same thing. He objected to each of the diagrams. He needed to object to at least the first picture to be able to argue that further objections would be futile. Therefore, the

---

5. Williams submitted State's Exhibits 9, 10, 11, 13, 14, 16, 19, and 20 to this court.

admission of the photographs is not preserved for our review because Williams did not object to their admission.

As to the diagrams, the nurse used them to point out Victim's injuries. Accordingly, they were relevant and corroborated her testimony. They were not graphic at all; they were simply black and white diagrams of a child's head, body, and vagina. They did not have any prejudicial effect. Therefore, the trial court did not err in admitting the diagrams.

## CONCLUSION

The trial court's admission of Williams's statements, denial of the directed verdict motion, and admission of the photographs and diagrams are

**AFFIRMED.**

HUFF and WILLIAMS, JJ., concur.