HILL, J.:
**377 Marshell Hill appeals his voluntary manslaughter conviction, contending the trial court erred by admitting several statements the State obtained in violation of Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), into evidence. We reverse and remand.
I.
Around midday on August 14, 2013, Greenville County Sheriff's officers responded to a 911 call by Michael Barksdale from his home in the Judson Mill community. The first responding officer found Billy Patterson deceased outside the home. The officers interviewed Barksdale and spoke with his roommate, Hill, but deemed Hill too intoxicated to be questioned. Officers observed that Hill, who is disabled due to a hip injury, relied on a cane to walk. Hill repeatedly volunteered that Patterson had ripped off the screen door of the home. The officers photographed the scene and retrieved several samples of blood evidence from the patio, screen door, and other areas. After the officers determined Hill had an outstanding bench warrant for failure to appear, he was arrested and transported to the Law Enforcement Center (LEC).
The next morning, Lead Investigator Fortner, along with Investigator Bailey, attended Patterson's autopsy and learned the cause of death was blunt force trauma caused by repeated blows from a cylindrical object such as a broom handle or cane. The Investigators went to sign Hill out of detention to question him, only to discover he had been released earlier that morning. They then obtained a search warrant for Barksdale's house and drove there to execute it. Hill was there when they arrived, having walked home from the LEC. Hill testified he had consumed "over a pint" since returning home. During **378 the search, the Investigators seized a wooden cane from Hill's bedroom. They then asked Hill to accompany them to the LEC so they could speak with him, promising to drive him back home later. Hill agreed.
The record is murky, but it appears the group arrived at the LEC around 3:00 p.m. The Investigators escorted Hill to a common work area for the homicide division, furnished with six desks and numerous chairs. No other people were present. Hill had not been handcuffed or advised he was in (or not in) custody. Rather than recording the interview, the Investigators typed a summary of Hill's statement on a "victim/witness" form, which reflected a time of 3:27 p.m. Hill explained in the statement that Patterson, a friend, came to Hill's house around 6 p.m., and they began drinking and watching television. Patterson later became unable to move, so Hill told him to lie on the floor. A few hours later, around 11 p.m., Barksdale came in from work and advised Hill to let Patterson "sleep it off." Soon thereafter, Patterson stood up and announced he was leaving but fell while holding the screen door, taking it to the ground with him. Hill and Barksdale managed to get Patterson back inside, where he slept a few more hours before leaving. Later in the night, Hill heard his dog barking, went outside, and saw Patterson sitting in the backyard next to the house. Hill came *347 outside again around 9 or 10 a.m. and noticed Patterson now had an injury to his eye and black and blue marks on his back. Hill gave Patterson some water. Around 11 a.m. or noon, Hill found Patterson had no pulse and asked Barksdale to call 911.
After Hill gave this statement, the Investigators left the room to confer, focusing on how Hill's version conflicted with Barksdale's. Fortner then resumed his questioning of Hill, recalling:
So we went back and talked with Mr. Hill. I brought up the television set. It was pretty obvious that he liked his television. He spoke about it that day while we were there and he had mentioned something about it during the course of our interview. So then I asked him if Mr. Patterson had maybe tried to steal his television while he was there? And I could tell by his actions ... he actually looked like he was about to cry. And he broke down and said that yes that he did. And then that he had tapped him twice.
**379 At this point, the Investigators took Hill across the hall to a video interview room. The video, admitted as a State's exhibit, begins at 5:17 p.m. and runs forty-six minutes. The video shows Hill, whose sobriety was questionable, initialed but did not sign a set of warnings printed on a Waiver of Rights form. When asked by the Investigators if he could read the warnings, he explained he did not have his glasses. When Hill remarked the Investigators had "already told him" he could not go home, Bailey responded "we didn't tell you you couldn't go home; we told you we could not make that decision until we find out what you have to tell us." The Investigators advised Hill they could not talk any further with him about what happened unless he signed the form, but the statement they wanted from him was "no more than what you've already said." They assured Hill they would not throw him any "curveballs." When Hill commented that by signing the form he would be "signing his rights away," the Investigators advised he was not signing his rights away, just "waiving" them by "setting them aside," and that "your rights are still there." They told him he was "probably going to jail tonight." Hill commented "my cane must have matched the bruises." Hill then agreed to talk provided it was "off the record," a condition never clarified. Bailey left the room and called an assistant solicitor for an opinion on Hill's refusal to sign the form. Upon his return, he informed Hill the solicitor "said we can talk with you without you signing this," but there is no confirmation Hill understood the significance of the development. At the Investigators' prodding, Hill confessed he hit Patterson numerous times with his cane when he caught Patterson trying to steal his television.
After a Jackson v. Denno , 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), hearing, the trial court observed the Investigators' questioning of Hill "turned" custodial after they conferred about the inconsistent evidence. The trial court, however, denied Hill's motion to suppress his statements. During Fortner's direct examination, Hill again objected to the admission of his statements made at the LEC. After hearing extensive arguments outside the jury's presence, the trial court concluded it was "a very close call" but again denied Hill's motion to suppress, finding Hill was not in custody when he gave the statements before being taken to the video **380 interview room, where he voluntarily waived his Miranda rights.
II.
Hill appeals the trial court's admission of two of his statements: his first confession that he "tapped" Patterson twice and his second confession captured on video. According to Hill, the first statement was inadmissible because it was the product of a custodial interrogation conducted without the required Miranda warnings. He claims the second confession, although made after he was given Miranda warnings, was excludable because it was procured in violation of Miranda by the Investigators' use of the "question first" method forbidden by Missouri v. Seibert , 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), and State v. Navy , 386 S.C. 294, 688 S.E.2d 838 (2010).
Statements made by a defendant during a custodial interrogation are inadmissible unless preceded by warnings from law enforcement informing the defendant of his *348 Miranda rights. See Berghuis v. Thompkins , 560 U.S. 370, 380, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). The State bears the burden of proving the defendant was properly advised of his Miranda rights, voluntarily waived them, and freely made the statement. See J.D.B. v. North Carolina , 564 U.S. 261, 269-70, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011). We review a trial court's custody ruling to determine if it is supported by the record. See State v. Evans , 354 S.C. 579, 583, 582 S.E.2d 407, 409 (2003).
A. The First Statement and Whether Hill Was In Custody
We first address Hill's statement that he "tapped" Patterson twice. There is no dispute Hill gave this statement while being interrogated without the benefit of Miranda , so the only issue is whether he was in custody when he made it.
A person is in custody if formally arrested or deprived of his freedom of action to a significant degree. See Miranda , 384 U.S. at 444, 86 S.Ct. 1602 ; Stansbury v. California , 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). We must decide if a reasonable person-faced with the same **381 circumstances confronting Hill-would have felt free to leave. See Yarborough v. Alvarado , 541 U.S. 652, 662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). Hill testified he believed he was not free to leave, but his subjective view is as weightless as the Investigator's conclusory testimony that Hill was not in custody. See J.D.B , 564 U.S. at 271, 131 S.Ct. 2394 (the subjective views of investigating officers and person being questioned are irrelevant). Our inquiry is objective, centering on whether one in Hill's position would have believed he was free to stop the questioning and depart. See id . It entails reconstructing the circumstances of the interrogation, such as the time, place, purpose, and length of the questioning. Evans , 354 S.C. at 583, 582 S.E.2d at 410. Other factors include the use or absence of physical restraints, the statements made by the police, and whether the defendant was released at the end of the encounter. Howes v. Fields , 565 U.S. 499, 509, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012).
Hill agreed to accompany the Investigators to the LEC, testifying he felt he had no choice, and it would have been "rude or disappointing" to refuse their invitation to transport him. Not every questioning at the police station is custodial, see California v. Beheler , 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) ; State v. Williams , 405 S.C. 263, 275, 747 S.E.2d 194, 200 (Ct. App. 2013), even if police view the person questioned as a suspect, see Oregon v. Mathiason , 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). But if the "invitation" is conditioned on the police escorting the defendant to the station, "a finding of custody is much more likely." 2 LaFave, et al., Criminal Procedure § 6.6(d) (4th ed. 2017). And if the police convey to the defendant that he is a suspect-by doubting his version of the events or presenting alternate versions based on other evidence they have collected-the atmosphere of the interrogation can objectively change to the point a reasonable person would think his freedom was restricted. See Stansbury , 511 U.S. at 325, 114 S.Ct. 1526 (officer's view of an interviewee's culpability may bear on the custody analysis if manifested by word or deed to interviewee "and would have affected how a reasonable person in that position would perceive his or her freedom to leave").
Hill was isolated with the Investigators while at the LEC. He was not physically restrained but had only been released **382 from jail a few hours earlier. There is no evidence the Investigators told Hill he could end the questioning at any time and leave. See Yarborough , 541 U.S. at 665, 124 S.Ct. 2140 (facts that interview occurred at police station, lasted two hours, and defendant was never told he was free to leave "weigh in favor of the view that [the defendant] was in custody"). Bailey's testimony that Hill was told several times he could stop the questioning at any time was unspecific and appears to refer to the statements he made to Hill to that effect on the video after Miranda warnings were administered. In the video, Bailey also mentions an earlier, pre- Miranda exchange with Hill, stating "we didn't tell you you couldn't go home; we told you we could not make that decision until we find out what you have to tell us." From this statement *349 alone, it can be can be inferred a reasonable person would have concluded he was not free to leave.
Also striking is the distinct change in the purpose of the questioning. The State emphasizes Hill's initial statement at the LEC was memorialized on a "victim/witness" form, which it contends corroborates Hill was not in custody. But Hill does not challenge this statement; he even agreed he gave it voluntarily. Instead, he challenges what happened after the Investigators left the room to discuss the inconsistencies between Hill's version and Barksdale's and returned to extend the interrogation to pursue their hunch about Hill's possessive relationship with his television. Of course, the Investigators also knew from the autopsy that the cane they had seized from Hill could be the murder weapon. The video revealed the Investigators had earlier told Hill "we know what happened," and Fortner testified he was trained to confront witnesses with available evidence. This shift in investigatory purpose and technique echoes what occurred in Navy , where it marked the point the court found the defendant was in custody. 386 S.C. at 298, 688 S.E.2d at 840 (officer's follow-up questioning of suspect was informed by their knowledge of autopsy results, and "[a]t this juncture, the nature of the interrogation and respondent's status changed, and what had begun as a voluntary question and answer session matured into custodial interrogation"); see also Evans , 354 S.C. at 584, 582 S.E.2d at 410 (affirming custody finding, noting circuit court was "most concerned" by the change in purpose of questioning from **383 routine to confrontational). Here, we agree with the trial court's initial instinct: when the Investigators realized Hill's statements conflicted with Barksdale's, "that is when they turned it into a custodial investigation."
The more than two hour length of the first unwarned questioning also points to a finding of custody. Compare Evans , 354 S.C. at 584, 582 S.E.2d at 410 (three hours; custody), with Williams , 405 S.C. at 275, 747 S.E.2d at 200 (fifteen to twenty minutes; no custody), and Mathiason , 429 U.S. at 495, 97 S.Ct. 711 (thirty minutes; no custody).
Viewing all these circumstances together and considering how a reasonable person would have perceived their impact on his freedom of movement, we conclude they add up to a finding that Hill was in custody when he stated he "tapped" Patterson twice. See J.D.B. , 564 U.S. at 270-71, 279, 131 S.Ct. 2394.
B. The Second Statement and Missouri v. Seibert
We next consider whether Hill's video confession made after he was given Miranda warnings was admissible. Hill argues it was not, relying on Seibert , which involved the police strategy of "question first": questioning an unwarned suspect until he confesses, then delivering the Miranda warnings "midstream," and having the suspect repeat the confession. Seibert , 542 U.S. at 609-15, 124 S.Ct. 2601. Seibert deemed this tactic undermined Miranda 's goal of reducing the risk of involuntary confessions procured by improper police pressure. Id . at 616-17, 124 S.Ct. 2601. Miranda warnings were designed to ensure one being interrogated while in police custody is not only informed of his rights but informed under circumstances "allowing for a real choice between talking and remaining silent." Id. at 609, 124 S.Ct. 2601. The "question first" tactic subverts this goal because one who is warned of his right to remain silent after he has already confessed is unlikely to think he retains a real choice to remain silent, making the midstream warnings meaningless. Id . at 612-14, 124 S.Ct. 2601.
Deciding whether Seibert applies involves comparing the circumstances of the first and second questioning, including the completeness and detail of the questions and answers in **384 the first round, the timing and setting of the first and second rounds, the continuity of police personnel, and the degree the police treated the second round as continuous with the first. Id. at 615, 124 S.Ct. 2601. These factors aid in determining whether the midstream warnings could be effective or just reduce Miranda to a shibboleth.
The first and second interrogations of Hill were similar. The same Investigators conducted the second round, which was held in a *350 room across the hall from where the first round had just ended. The Investigators treated the rounds as continuous, even telling Hill they only wanted him to tell them "no more than what you've already said." See id. at 616-17, 124 S.Ct. 2601 ("The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as part of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before."); see also id . at 621, 124 S.Ct. 2601 (Kennedy, J., concurring) ("Reference to the prewarning statement was an implicit suggestion that the mere repetition of the earlier statement was not independently incriminating. The implicit suggestion was false."). We cannot suspend reality and find the Miranda warnings effective at the late stage they were given.
Navy made clear Seibert did not rest on whether the police deliberately used the "question first" tactic. Navy , 386 S.C. at 304, 688 S.E.2d at 842. Here, there is no direct evidence the Investigators set out to skirt Miranda , and it would be naïve to think we would find some. Seibert , 542 U.S. at 616 n. 6, 124 S.Ct. 2601 (noting evidence of intent will rarely surface, "so the focus is on facts apart from intent that show the question-first practice at work"). However, this is not a situation like Oregon v.Elstad , 470 U.S. 298, 301, 312-13, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), where a defendant's unwarned inculpatory statement-uttered in response to an arresting officer's offhand comment that he "felt" the defendant was involved in a burglary-did not render later Miranda warnings given to the defendant at the station ineffective. Here, we do not have a Miranda mistake made in the heat of arrest but a calculated investigatory interview structured by veteran homicide investigators **385 who at times pitched Hill doubletalk. Justice Kennedy's concurrence in Seibert ventured such a Miranda breach could be cured if there was a substantial break in the time and environment of the first and second interviews, or if the defendant was advised his first confession could not be used against him. Seibert , 542 U.S. at 622, 124 S.Ct. 2601. Neither occurred here.
We therefore hold Seibert requires exclusion of Hill's post- Miranda statements. See Berkemer v. McCarty , 468 U.S. 420, 437, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated.").
III.
As the trial court conscientiously recognized, the issues here are close, and they were not presented to the trial court in the most ideal or conspicuous form. From our perspective, however, the trial court's rulings find insufficient support in the record. We therefore hold the trial court erred by not excluding Hill's first and second confessions from evidence.
REVERSED AND REMANDED.
KONDUROS and MCDONALD, JJ., concur.