# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

James Elbert Daniels, Jr., Appellant.

Appellate Case No. 2018-001630

---

Appeal From Horry County
Robert E. Hood, Circuit Court Judge

---

Opinion No. 5986
Heard June 15, 2021 – Filed May 24, 2023

---

**AFFIRMED**

---

Deputy Chief Appellate Defender Wanda H. Carter, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, Senior
Assistant Attorney General J. Anthony Mabry, and
Assistant Attorney General Mark Reynolds Farthing, all
of Columbia; and Solicitor Jimmy A. Richardson, II, of
Conway, for Respondent.

---

**MCDONALD, J.:** In January 2015, two masked men robbed three Horry County
convenience stores; the men shot and killed the clerk at one store and an employee
at another. James Elbert Daniels, Jr. served as the scout before his masked
accomplices entered the stores. Daniels now appeals his convictions for murder

and armed robbery, arguing law enforcement elicited his incriminating statements in violation of his constitutional rights.  As evidence supports the circuit court's findings that Daniels voluntarily accompanied officers to a police substation and his initial thirty-one minute interview was not custodial, we affirm the convictions.

**Facts and Procedural History**

On January 2, 2015, Daniels entered the Sunhouse convenience store at the intersection of Highway 905 and Red Bluff Road in Longs (Sunhouse #1) and purchased a bottle of lemonade.  Minutes after Daniels exited the store, Jerome "J.J." Jenkins, Jr. and McKinley Daniels (Brother) entered.  Both were masked and armed with handguns.  The two men first encountered and shot at Sunhouse employee Jimmy McZeke, but both missed.  McZeke ran to the back of the store and locked himself in a bathroom.  Jenkins followed and shot at him through the bathroom door, shattering some glass bottles that cut McZeke's head.

While Jenkins chased McZeke, Brother remained at the front of the store.  Brother pointed his pistol at the store clerk, 40-year-old Bala Paruchuri, and grabbed money from the cash register.  As Jenkins and Brother were leaving the store, one of the men shot and killed Paruchuri.[1]  The Sunhouse #1's video surveillance cameras captured footage of the robbery and the murder.

On January 25, 2015, the trio robbed two other convenience stores in the area.  Again, Daniels served as the scout; Jenkins and Brother then entered and robbed the stores.  Barbara McDowell was working at the Scotchman on Lake Arrowhead Road in Myrtle Beach on an unusually quiet night when, through the store window, she saw "two guys scrunched down" outside.  She watched as the two men, whom she was unable to identify because they were "totally covered," entered the Scotchman through the front door.  McDowell testified, "One of the guys went straight behind the counter, and the other guy came straight towards me."  The man who approached McDowell had a gun, so she emptied the two cash registers and gave him approximately fifty dollars in cash before both men fled on foot.  As soon as the men left the store, McDowell pushed the panic button.  Because the Scotchman is on a cul-de-sac, McDowell watched for a car to drive back down the road but never saw one.  Law enforcement responded and viewed the store's video surveillance footage in an effort to identify the men, while bloodhounds lost their trail at the edge of the store parking lot.

---

[1] Both masked men fired their weapons at Paruchuri as they fled.

Within hours of the Scotchman robbery, two men robbed the Sunhouse at Cultra Road and Oak Street in Conway (Sunhouse #2) and killed thirty-year-old employee Trisha Stull. Officers responded and watched the surveillance video, which showed two masked men enter and go behind the counter. According to Lieutenant Peter Cestare of the Horry County Police Department (HCPD), shots were fired in the store and some cash and a purse were taken. While watching the videos from the Scotchman and Sunhouse #2, Lt. Cestare noticed a clothing pattern of "red pants and gray sweatshirt," which led him to believe the same men robbed both stores. Lt. Cestare also viewed the surveillance from the Sunhouse #1 crime scene and believed he had "seen that same clothing attire in that store, not during the commission of the robbery, but earlier on in that store."

While watching the video from the Sunhouse #1, Lt. Cestare saw "a vehicle of interest" and "a couple of subjects of interest." He testified that approximately twenty-two minutes prior to the robbery, "a subject was in that store, oddly enough, wearing red pants and a . . . dark color gray . . . hooded sweatshirt," similar to the clothing in the footage from the Sunhouse #2 and Scotchman. Lt. Cestare also saw a car, which he believed to be a silver Chevy Malibu, arrive at both the Sunhouse #1 and Sunhouse #2 prior to the robberies.

Tyler Jennings Luther, a South Carolina Highway Patrol accident reconstructionist and member of the Multidisciplinary Accident Investigation Team (MAIT team), viewed the videos from the Sunhouse #1 and Sunhouse #2 and advised the HCPD that the vehicle in both videos was a 2008 to 2012 Chevrolet Malibu.

The South Carolina Law Enforcement Division (SLED) generated a list of Malibu owners in the area and connected the same firearm to all three casings recovered from the Sunhouse #1. SLED further determined the same firearm was used to fire the two casings recovered from the Sunhouse #2. SLED ultimately concluded all five casings were ejected from the same weapon. Although there was no gun to use for comparison, a SLED firearms specialist opined the cartridges were most likely fired by a Hi-Point weapon.

After developing Daniels as a suspect and learning his girlfriend, LaShania Chestnut, drove a silver Malibu, officers went to Chestnut's home to interview Daniels. Upon arrival, officers saw the Malibu; thus, they obtained a search warrant and seized the vehicle.[2] Daniels and Chestnut agreed to accompany

---

[2] A search of the Malibu revealed "red, white and black headgear attire," which an officer described as similar to that worn by one of the men in the armed robberies.

officers to the west precinct in Green Sea for interviews, and the two rode in separate unmarked cars to the substation. The two were not handcuffed during the ride, and no officer advised Daniels of his *Miranda*[3] rights prior to his initial interview. Instead, HCPD Senior Detective Greg Lent waited until "it became apparent . . . that there was most likely further information that [Daniels] was going to provide that . . . would cause [an officer] to place him under arrest." Approximately thirty minutes into the interview, Detective Lent advised Daniels of his *Miranda* rights; Daniels subsequently identified Brother[4] and Jenkins[5] as the men who robbed all three stores.[6] Following Daniels's arrest, Detective Lent questioned him again the following day at the Horry County Detention Center.

The Horry County grand jury indicted Daniels on two counts of armed robbery and murder. At Daniels's trial, the jury found Daniels guilty as indicted, and the circuit court sentenced him to life imprisonment without the possibility of parole.

**Standard of Review**

"In criminal cases, appellate courts are bound by fact finding in response to preliminary motions where there has been conflicting testimony or where the findings are supported by the evidence and not clearly wrong or controlled by an error of law." *State v. Asbury*, 328 S.C. 187, 193, 493 S.E.2d 349, 352 (1997). "Appellate review of whether a person is in custody is confined to a determination

---

Law enforcement also recovered a blue bandana similar to that worn by one of the perpetrators.

[3] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[4] During a search of Daniels and Brother's home, officers seized a black hooded sweatshirt with a tear under one shoulder that can be seen in the surveillance videos from two of the robberies. Officers also seized a pair of Nike Air high-tops with neon green soles—again, visible in one of the robbery videos.

[5] A search warrant executed at Jenkins's home revealed the same athletic shoes worn by Jenkins during the robberies—Nike low-tops with a silver emblem.

[6] Jenkins was convicted of murder and armed robbery and sentenced to death. *See State v. Jenkins*, 436 S.C. 362, 872 S.E.2d 620 (2022). Brother pled guilty to murder and armed robbery. The circuit court sentenced Brother to forty-five years for the murder and thirty years for armed robbery.

of whether the ruling by the trial judge is supported by the record." *State v. Evans*, 354 S.C. 579, 583, 582 S.E.2d 407, 409 (2003). The appellate court will reverse a trial court's ruling on the voluntariness of a confession only when the ruling is "so erroneous as to constitute an abuse of discretion." *State v. Myers*, 359 S.C. 40, 47, 596 S.E.2d 488, 491 (2004).

**Law and Analysis**

Daniels argues the circuit court erred in admitting into evidence his interviews with law enforcement because the interrogating officers used an unconstitutional "question-first" tactic to elicit incriminating statements in his initial interview, rendering any subsequent waiver of his *Miranda* rights involuntary. We disagree.

Pretrial, defense counsel moved to exclude Daniels's police interviews, and the circuit court held an in camera hearing. Detective Lent testified Daniels was identified by another police officer as a person "inside the store prior to one of the armed robberies." The surveillance videos from the crime scenes enabled officers to identify the car Daniels drove; on the night of the first robbery and murder, the Malibu passed by the Sunhouse #1 several times and then left the scene "at a decent rate of speed and running through a red light." Once officers identified the Malibu, Detective Lent and several other detectives went to Chestnut's home in unmarked cars.

Upon their arrival around 8:00 p.m. on February 5, 2015, the officers saw a car in Chestnut's yard that "looked to be the same vehicle" seen in the videos. Because Daniels was at work, officers initially spoke to Chestnut, who told them that although she owned the vehicle, Daniels "had control and would use her car." When Chestnut's mother called Daniels at work and told him police officers were there questioning his pregnant girlfriend, Daniels left his work site and came to Chestnut's house. By the time Daniels arrived, Chestnut was seated in a police car. Detective Lent then asked if the couple would come to the police precinct in Green Sea to speak with investigators. Detective Lent testified Daniels and Chestnut were not under arrest, were not in custody, and voluntarily agreed to accompany officers to the substation. Officers drove the two, uncuffed, in separate unmarked cars. At the conclusion of his direct examination testimony, Detective Lent stated:

> If [Daniels] would've asked—if he would've told us he
> didn't wish to speak with us and would've asked to [be]
> taken home or had told us that he did not wish to go to

the west precinct to speak with us, we … would not've
spoken to him or we would've driven him home.

At approximately 9:45 p.m. that evening at the Green Sea precinct, which shares space with the magistrate's office, Daniels met with officers in one room while Chestnut met with others in a separate office. Detective Lent, accompanied by another officer, then interviewed Daniels for thirty-one minutes prior to advising him of his *Miranda* rights. During that pre-*Miranda* time, Detective Lent questioned Daniels about his work schedule, contact information, the circumstances of his car being in the repair shop, and his whereabouts on certain days and nights in January.

Detective Lent testified he questioned Daniels about his work schedule because he "wanted to find out . . . if he had access to [Chestnut's] car, if he was even in the area or around, or would've been able to have been free on the dates when these crimes [were] committed." Daniels's answers led Detective Lent to believe Daniels "would've been off work at the time these crimes were committed, and that he . . . would've had access to [Chestnut]'s vehicle at the times those crimes were committed." Detective Lent noted Daniels's "body language and just his demeanor during the course of the interview" led Detective Lent to believe that if he continued to speak to Daniels, "there was a possibility other information would end up coming out, that he was possibly involved." Thus, at that point in the interview, Detective Lent told Daniels "we need to talk about that store that night" and advised Daniels of his *Miranda* rights.

Detective Lent explained he verbally advised Daniels rather than using the written warning and waiver because he "wanted to make things as smooth as possible . . . and [he] knew [another officer] was recording the interview so it would be memorialized." Following the advisement of rights, Detective Lent and another officer continued the interview for approximately an hour before arresting Daniels.

The following day, Detective Lent again interviewed Daniels, this time at the jail. According to Detective Lent, "[t]here was another individual who was stating that somebody else had possibly been at [Sunhouse #2]." Detective Lent spoke with Daniels again "to clear up or just to confirm" what Daniels told him "in the original statement."

Relying upon *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality opinion) and *State v. Navy*, 386 S.C. 294, 688 S.E.2d 638 (2010), Daniels moved to exclude all

of his statements to law enforcement because one-third of his initial interview was conducted prior to any officer advising him of his *Miranda* rights. Daniels argued that under the totality of the circumstances, he was in custody during the entirety of the first interview; he noted the heavy law enforcement presence at Chestnut's home and at the precinct, the fact that he was not permitted to drive himself to the precinct, and Chestnut's separate transport and interrogation all demonstrated he was not free to leave at any point during the initial interview. Daniels also challenged Detective Lent's claim that the police would have permitted Daniels to leave had he asked.

In support of his motion to exclude the statements, Daniels demonstrated that during the first interview, Detective Lent pinned down important incriminating information, such as Daniels's work schedule, his access to and use of Chestnut's car during the relevant time periods, and his presence at the Sunhouse #1 on the day of the robbery. Only after obtaining this information did Detective Lent advise Daniels of his rights to remain silent and to an attorney. Daniels conceded nothing in the record indicates Detective Lent knew from the moment he started the questioning that Daniels was the scout for the armed robberies. However, he asserted, "I don't think that there's any doubt that that's what they thought from the way the questions are . . . when you read the way the questions come in the second part of that first statement, you see how [Detective Lent] boxes [Daniels] in from the information at the beginning" of the interview.

Daniels noted Detective Lent's failure to obtain a written waiver despite being in a police substation where such documents are readily available. Moreover, Daniels asserts Detective Lent never obtained his verbal or nonverbal assent that he understood his rights as Detective Lent recited them to him.[7]

Addressing the *Seibert* factors,[8] Daniels argued "the timing and setting of the first questioning" were "exactly the same," as were the personnel. Additionally, the

---

[7] Detective Lent was subsequently recalled and testified that during the advisement of rights, Daniels "was nodding and agreeing, yes, I understand, I understand. He nodded throughout the entire reading of *Miranda*."

[8] A court weighs four factors in considering whether a *Seibert* violation has occurred: "1) the completeness and detail of the question[s] and answers in the first round of interrogation; 2) the timing and setting of the first questioning and the second; 3) the continuity of police personnel; and 4) the degree to which the interrogator's questions treated the second round as continuous with the first."

detectives treated the second round of questioning as a continuation of the first. Finally, Daniels argued *Miranda* required suppression of his subsequent statement at the jail because it was tainted by the initial interrogation conducted without warnings through the improper question-first tactic.

In response to Daniels's challenge, the State referenced Daniels's voluntary appearance at Chestnut's home after Chestnut's mother called to alert him to the presence of police officers at the house. As to the voluntariness of his February 5 initial statement, the State noted Daniels was free to leave "but he never did." Regarding the timing of the *Miranda* warnings, the State argued "it was an absolute textbook example of when a detective realizes that he'd better stop asking questions and *Mirandize* this person when he felt as if it was getting into an area that may be a concern." Addressing the question-first tactic, the State contends Daniels made no incriminating statements pre-*Miranda*:

> He absolutely says that I went in and bought a soda. He doesn't have a mask on, no crime has been committed, putting himself in a place buying a soda in an area where he lives; there's nothing incriminating about it.
>
> As it relates to the details and the completeness of the first statement, [Detective Lent] spent 15 pages talking about [Daniels's] work schedule and never got anything incriminating, not even an admission of any kind beyond historical information concerning work.

Although the continuity of police personnel was the same, the State argued the timing of the subsequent jail interview demonstrates this was not a continuous statement as there was a clear break between the pre- and post-*Miranda* interviews.

After hearing the evidence and arguments of counsel, the circuit court found: when law enforcement arrived at Chestnut's home, the only information they had was that Daniels was at the Sunhouse #1 prior to the armed robbery and Chestnut drove a silver Chevy Malibu; Daniels voluntarily came to Chestnut's house from work, knowing the police were there; Daniels and Chestnut both agreed to accompany officers for questioning; there was no evidence either Daniels or Chestnut was

---

*Navy*, 386 S.C. at 302, 688 S.E.2d 838, 841–42.

under arrest; and because Daniels did not confess to committing any criminal act during the pre-*Miranda* portion of the interview, his statements were admissible.

Ultimately, the circuit court concluded Daniels was "given the appropriate *Miranda* warnings," and based on the additional testimony from Detective Lent, Daniels "agrees and goes along with [the interview] after acknowledgment of his constitutional rights with the decision to continue to talk to law enforcement." Thus, the circuit court found no violation of either *Miranda* or *Seibert*. The circuit court held the totality of the circumstances demonstrated Daniels was not in custody for the first thirty-one minutes of the interview, detailing its findings that Daniels was at a police precinct rather than headquarters or the jail, was not handcuffed, was not forced to accompany the officers, and suffered no denial of creature comforts, no threats, and no intimidation. Finally, the circuit court found Daniels made his interview statements freely, voluntarily, knowingly, and intelligently after he was advised of and waived his constitutional rights.

"[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession and even though there is ample evidence aside from the confession to support the conviction." *Jackson v. Denno*, 378 U.S. 368, 376 (1964) (citation omitted). *Miranda* mandates "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. The United States Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* A defendant "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.*

In *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977), the Supreme Court considered *Miranda* in the context of a station-house interview of a suspect who voluntarily participated in the interview and met police at the station for that purpose. Finding Mathiason was not in custody for purposes of *Miranda*, the Court stated:

> [T]here is no indication that the questioning took place in
> a context where respondent's freedom to depart was

restricted in any way.  He came voluntarily to the police station, where he was immediately informed that he was not under arrest.  At the close of a ½-hour interview[,] respondent did in fact leave the police station without hindrance.  It is clear from these facts that Mathiason was not in custody "or otherwise deprived of his freedom of action in any significant way."

*Id.* at 495.  The Court reaffirmed *Mathiason* in *California v. Beheler*, 463 U.S. 1121, 1124–25 (1983), explaining, "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *Id.* at 1125 (quoting *Mathiason*, 429 U.S. at 495).

"*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."  *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).  "[T]he definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response."  *Id.* at 302.  Two discrete inquiries are essential to the ultimate "in custody" determination for *Miranda* purposes: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

In *Evans*, the defendant went to the police station accompanied by her family after her three children perished in a mobile home fire.  354 S.C. at 581, 582 S.E.2d at 408.  Two police officers took the defendant "into a back office to take her statement" but did not advise her of her *Miranda* rights.  *Id.* at 581, 582 S.E.2d at 409.  The officers, who knew the fire they were investigating was started with an accelerant, told Evans they did not believe her story regarding the fire.  *Id.* at 581, 582 S.E.2d at 408–09.  Evans was "shaking, sobbing, and very nervous" when the two male police officers left the room and sent in a female SLED agent, who used a sympathy tactic with her.  *Id.*  The two women were in the room for at least forty-five minutes until Evans went to the bathroom; the SLED agent followed and waited for Evans outside the bathroom door.  *Id.* at 582, 582 S.E.2d at 409.  Evans eventually confessed to setting the deadly fire.  *Id.*

Our supreme court found Evans was in custody even though she was not formally arrested until after giving her statement. *Id.* at 584, 582 S.E.2d at 410. The court explained, "To determine whether a suspect is in custody, the trial court must examine the totality of the circumstances, which include factors such as the place, purpose, and length of interrogation, as well as whether the suspect was free to leave the place of questioning." *Id.* When analyzing whether the defendant was free to leave, the court emphasized the fact that the SLED agent accompanied the defendant to the restroom and waited outside the door. *Id.* The court was also persuaded the defendant was in custody because she was interviewed in a back office in the police station, her cousin was not allowed to go into the interview room, and the interview lasted three hours. *Id.* The court concluded the officers' purpose for the interview changed from routine inquiry to the questioning of a suspect when the female officer entered the interrogation room. *Id.*

In *Seibert*, the defendant's twelve-year-old son, Jonathan, died in his sleep. 542 U.S. at 604. Seibert feared charges of neglect because Jonathan, who was born with cerebral palsy, had bedsores. *Id.* In Seibert's presence, two of her teenage sons and two of their friends devised a plan to incinerate Jonathan's body in the course of burning the family's mobile home, in which they planned to leave Donald Rector, a mentally ill teenager living with the family, to avoid any appearance that Jonathan had been left unattended. *Id.* Seibert's son Darian and a friend set the fire, and Donald died. *Id.*

Five days later, the police awakened Seibert at 3:00 a.m. at the hospital where Darian was being treated for burns. *Id.* Following instructions from another officer, the arresting officer initially refrained from giving Seibert *Miranda* warnings. *Id.* After Seibert was transported to the police station and left alone in an interview room for fifteen to twenty minutes, the officer questioned her for thirty to forty minutes, squeezing her arm, and repeating "Donald was also to die in his sleep." *Id.* at 604–05. After Seibert admitted she knew Donald was meant to die in the fire, the officer permitted Seibert a twenty-minute break. *Id.* at 105. He then turned on a tape recorder, *Mirandized* Seibert, and had her sign a waiver of rights. *Id.* The questioning resumed, and the officer confronted Seibert with her pre-*Miranda* statements. *Id.* Again, the officer obtained the answer he wanted— Seibert knew Donald would die in the fire. *Id.*

The trial court suppressed the pre-*Miranda* statement but admitted the discussion that occurred post-*Miranda*. *Id.* at 606. On appeal from her conviction of second-degree murder, the Missouri Court of Appeals affirmed. *Id.* The Supreme Court of Missouri reversed, holding, "[i]n the circumstances here, where the

interrogation was nearly continuous, . . . the second statement, clearly the product of the invalid first statement, should have been suppressed." *Id.* (quoting *Missouri v. Siebert*, 93 S.W.3d 700, 701 (2002) (en banc)). The court reasoned the arresting officer's purposeful omission of *Miranda* "was intended to deprive Seibert of the opportunity knowingly and intelligently to waive her *Miranda* rights." *Id.* (quoting *Siebert,* 93 S.W.3d at 706). "Since there were 'no circumstances that would seem to dispel the effect of the *Miranda* violation,' the court held that the postwarning confession was involuntary and therefore inadmissible." *Id.* "To allow the police to achieve an 'end run' around *Miranda*," would encourage *Miranda* violations and diminish *Miranda*'s role in protecting the privilege against self-incrimination. *Id.*

The United States Supreme Court affirmed the reversal, explaining "[t]he object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611. The "threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Id.* at 611–12. The Court held "when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *Id.* at 613–14 (quoting *Moran v. Burbine*, 475 U.S. 421, 424 (1986)). In finding Seibert's post-*Miranda* statements inadmissible, the Court explained "[t]he unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid." *Id.* at 616–17.

However, the Supreme Court distinguished *Seibert* in *Bobby v. Dixon*, 565 U.S. 23 (2011), noting:

> In *Seibert*, police employed a two-step strategy to reduce the effect of *Miranda* warnings: A detective exhaustively questioned Seibert until she confessed to murder and then, after a 15- to 20-minute break, gave Seibert *Miranda* warnings and led her to repeat her prior confession. The Court held that Seibert's second confession was inadmissible as evidence against her even though it was preceded by a *Miranda* warning. A plurality of the Court reasoned that "[u]pon hearing

warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Seibert*, 542 U.S. at 613. Justice KENNEDY concurred in the judgment, noting he "would apply a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning."

In this case, no two-step interrogation technique of the type that concerned the Court in *Seibert* undermined the *Miranda* warnings Dixon received. In *Seibert*, the suspect's first, unwarned interrogation left "little, if anything, of incriminating potential left unsaid," making it "unnatural" not to "repeat at the second stage what had been said before." *Id.* at 616–17. But in this case Dixon steadfastly maintained during his first, unwarned interrogation that he had "[n]othing whatsoever" to do with Hammer's disappearance. Thus, unlike in *Seibert*, there is no concern here that police gave Dixon *Miranda* warnings and then led him to repeat an earlier murder confession, because there was no earlier confession to repeat.

*Id.* at 30–31 (alterations by Court).

Here, there is no dispute that Daniels participated in the initial thirty-one minutes of questioning without the benefit of *Miranda* warnings. While our inquiry focuses on whether Daniels was in custody when initially questioned, the State persuasively argues the content of Daniels's initial statements, specifically the lack of any confession, is pertinent to the inquiry.

Detective Lent's questioning of Daniels during the first thirty minutes was conversational in nature and officers offered Daniels food and a drink. He initially questioned Daniels about his own vehicle; Daniels responded that his car was not working in January 2015, so he used Chestnut's car during that time period. While Daniels admitted to having access to a car matching the vehicle in the surveillance

videos, law enforcement already knew this from their earlier discussions with Chestnut.

Next, Detective Lent questioned Daniels about his work schedule, and Daniels told him which days and times he worked during the month of January. Detective Lent testified he questioned Daniels about his work schedule because he "wanted to find out . . . if he had access to the car, if he was even in the area or around, or would've been able to have been free on the dates when these crimes had been committed." Daniels's answers led Detective Lent to believe Daniels "would've been off work at the time these crimes were committed, and that he . . . would've had access to Ms. Chestnut's vehicle at the times those crimes were committed."

Finally, Detective Lent questioned Daniels about his whereabouts and conduct on the day of the armed robbery and murder at the Sunhouse #1.  When Daniels told Detective Lent that he and Brother bought a soda at the Sunhouse #1 on January 2, 2015—a fact detectives already knew from the surveillance footage—Detective Lent told Daniels they needed to have a "serious talk" because he did not know if Daniels would tell him there "was a dead midget buried in the backyard" or something similarly incriminating.  Detective Lent said he was "afraid of what would come out" and people sometimes say "off-the-wall and crazy stuff," thus, he advised Daniels of his *Miranda* rights to "cover" any incriminating statements Daniels might make.

Our supreme court addressed *Seibert* and the improper two-step interview technique in *Navy*, 386 S.C. 294, 688 S.E.2d 838.  After the death of Navy's toddler son, Navy gave a statement at the hospital but because he was so upset and distraught, it was thought to be incomplete.  *Id.* at 297, 688 S.E.2d at 839.  The following day, after learning the child's cause of death was smothering or suffocation, officers went to Navy's home to transport him to the sheriff's office for further questioning.  *Id.*  There, Navy gave a statement at 9:50 a.m., in which he described his panic after noticing the child was having breathing problems.  *Id.* at 297–98, 688 S.E.2d at 839.

After Navy gave this statement, police officers informed him that the child had suffocated and noted the toddler's previously broken ribs.  *Id.* at 298, 688 S.E.2d at 840.  Navy asked if he was under arrest and was told, "No, we are just trying to get some answers."  *Id.*  "At this juncture, the nature of the interrogation and [Navy]'s status changed, and what had begun as a voluntary question and answer session matured into custodial interrogation."  *Id.*  "In response to these follow-up questions, [Navy] told the officers he had 'popped' the child on the back rather than

simply patted him, and that he may have 'patted' the child on [his] mouth to stop the crying." *Id.* at 298–99, 688 S.E.2d at 840. Navy received a smoke break, and officers decided "it was now appropriate to give [Navy] *Miranda* warnings and administered them to [him] at 11:35 am." *Id.*

Navy then gave his second statement—this time in writing. *Id.* This statement mirrored the first; however, Navy also admitted to (1) placing his hand over the child's mouth multiple times to stop the child's crying, (2) possibly covering the child's nose as well, (3) "popping" the child on the back, causing the child to cry out "real loud," and (4) feeling frustrated by the child's crying. *Id.* at 299–300, 688 S.E.2d at 840. Following this statement, officers contacted the pathologist who conducted the autopsy to ask whether the actions Navy disclosed in his second statement "could have caused" the child's death. *Id.* at 300, 688 S.E.2d at 840. The pathologist advised such could not have caused the child's death as Navy would have had to cover the child's nose and mouth for at least a minute. *Id.* Officers then obtained a third statement from Navy, also in writing, at 12:25 pm. *Id.* In that statement, Navy admitted he could have held his hand over the child's nose and mouth for "a minute, not more than two minutes." *Id.* at 300, 688 S.E.2d at 840–41.

The circuit court admitted all three statements, finding Navy "was not in custody, was not significantly deprived of his freedom, and that the first statement was voluntary and no *Miranda* [warnings] were required." *Id.* at 301, 688 S.E.2d at 841. As to the second and third statements, the circuit court found the statements were freely and voluntarily made after Navy had been given the proper *Miranda* warnings. *Id.* On appeal, this court reversed, finding none of the three statements should have been admitted. *Id.* As to the first statement, our supreme court disagreed, determining "it is debatable whether a reasonable person would have believed himself to be in custody at the time the first statement was given, and thus the trial court's finding that respondent was not in custody should have been upheld as it is supported by the record." *Id.* The supreme court agreed the second and third statements should have been suppressed because they were obtained in violation of the rule announced in *Seibert*. *Id.* at 302, 688 S.E.2d at 841.

More recently, this court reversed a conviction when the trial court erroneously admitted the defendant's statement based upon investigators' improper use of a question-first tactic in obtaining a confession. *See State v. Hill*, 425 S.C. 374, 822 S.E.2d 344 (Ct. App. 2018). There, when police officers arrived at the scene where an individual had died, they determined Hill, who was also present, was too intoxicated to be questioned. *Id.* at 377, 822 S.E.2d at 346. The following day,

officers learned the decedent had died as a result of blunt force trauma caused by an object such as a broom handle or cane. *Id.* Because the officers remembered Hill walked with a cane, they returned to question him. *Id.* Hill agreed to accompany the officers to the law enforcement center for questioning once they promised to drive him back home. *Id.* at 378, 822 S.E.2d at 346. Hill met with officers in "a common work area," which was "furnished with six desks and numerous chairs." *Id.* "Hill had not been handcuffed or advised he was in (or not in) custody." *Id.* The police questioned Hill regarding the victim's death, but Hill did not provide any incriminating information. *Id.* at 378, 822 S.E.2d at 346–47. After conferring, one officer asked Hill a direct question about his television; Hill responded that the victim tried to steal his television and that Hill "tapped him twice" as a result. *Id.* at 378, 822 S.E.2d at 347.

Thereafter, the officers took Hill, "whose sobriety was questionable," across the hall to an interview room, where Hill "initialed but did not sign a set of warnings printed on a Waiver of Rights form." *Id.* at 379, 822 S.E.2d at 347. Although Hill stated the officers told him he could not go home, an officer countered that Hill was told the police could not make that decision until they found out what he had to say. *Id.* The officers advised Hill they "could not talk any further with him about what happened unless he signed the form, but the statement they wanted from him was 'no more than what [he] already said.'" *Id.* Further, the officers indicated Hill would not be "signing his rights away"; rather, he would be "'waiving' them by 'setting them aside.'" *Id.* Ultimately, the officers interrogated Hill without requiring him to sign the waiver. *Id.* "At the [i]nvestigators' prodding, Hill confessed he hit [the victim] numerous times with his cane when he caught [the victim] trying to steal his television." *Id.*

On appeal, Hill challenged the admissibility of his first statement that he "tapped" the victim twice and his second statement that he caned the decedent numerous times. *Id.* at 380, 822 S.E.2d at 347. This court explained the admissibility of the first statement turned on whether Hill was in custody, which would require an advisement of his rights. *Id.* at 380, 822 S.E.2d at 348. The question presented required the court to determine "if a reasonable-person—faced with the same circumstances confronting Hill—would have felt free to leave." *Id.* at 380–81, 822 S.E.2d at 348. After examining "the time, place, purpose, and length of the questioning," as well as "the use or absence of physical restraints, the statements made by police, and whether the defendant was released at the end of the encounter," this court concluded Hill was in custody when he told officers he "tapped" the victim twice with his cane. *Id.* at 383, 822 S.E.2d at 349.

Turning to the admissibility of Hill's statement after he was advised of his *Miranda* rights, this court noted the first and second interrogations were similar as they involved the same police officers, occurred in a room just across the hall from the room where the first interrogation occurred, and the officers treated the interrogations as continuous. *Id.* at 383–84, 822 S.E.2d at 349–50. In this instance, the court could not "suspend reality and find the *Miranda* warnings effective at the late stage they were given." *Id.* While the court did not find the investigators "set out to skirt *Miranda*," the court characterized the interrogations as "a calculated investigatory interview structured by veteran homicide investigators who at times pitched Hill doubletalk." *Id.* at 384–85, 822 S.E.2d at 350. Thus, the court found Hill's second statement to law enforcement was inadmissible. *Id.* at 385, 822 S.E.2d at 350.

Regarding Daniels's first statement, as our supreme court found in *Navy*, "it is debatable whether a reasonable person would have believed himself to be in custody at the time the first statement was given." 368 S.C. at 301, 688 S.E.2d at 841. Accordingly, the circuit court's finding that Daniels was not in custody should be "upheld as it is supported by the record." *Id.* Daniels was asked—not required—to ride to the substation with police officers for questioning; he was questioned in an office and did not ask to leave; he was offered creature comforts; and the initial pre-*Miranda* questioning lasted only about half an hour. *See Evans*, 354 S.C. at 583, 582 S.E.2d at 410 ("To determine whether a suspect is in custody, the trial court must examine the totality of the circumstances, which include factors such as the place, purpose, and length of interrogation, as well as whether the suspect was free to leave the place of questioning.").

Detective Lent testified Daniels was not in custody upon his arrival at the precinct. As in *Hill*, we find it difficult to characterize law enforcement's asking an individual to come to the station as a true invitation. However, nothing in the record contradicts Detective Lent's testimony that Daniels voluntarily accompanied officers to the precinct and that had he asked to leave, officers would have let him go. Daniels chose to leave his job and go to Chestnut's house when he learned the police were there, and neither Daniels nor Chestnut was handcuffed during the ride. These circumstances support the circuit court's finding that Daniels was not in custody during the initial thirty-minute portion of the interview.

As to the *Seibert* factors, the "timing and setting" as well as the personnel from the initial questioning on February 5, 2015, were "exactly the same," as in the post-*Miranda* round of questioning that evening. Additionally, the record shows the detectives treated the second round of questioning as a continuation of the first;

there was not even a quick break following the verbal *Miranda* warnings and the line of questioning piggybacking on the initial inquiries.

However, the *Seibert* factor addressing "the completeness and detail of the question[s] and answers in the first round of interrogation" is absent here. At oral argument before this court, Daniels acknowledged as much but argued "a full blown confession" is not needed to satisfy this factor. This is a legitimate argument, but the rationale behind the Court's ruling in *Seibert*—that a person who has confessed and is only informed of his *Miranda* rights before being asked to repeat what he has already said has received no effective advisement—is inapplicable here because Daniels gave no pre-*Miranda* confession, and Detective Lent did not seek one. *See, e.g.*, *Dixon*, 565 U.S. at 31 ("Thus, unlike in *Seibert*, there is no concern here that police gave Dixon *Miranda* warnings and then led him to repeat an earlier murder confession, because there was no earlier confession to repeat."). When it became apparent Daniels might make an admission of guilt, Detective Lent stopped the interview and read him his rights.[9]

It was only after he was given *Miranda* warnings that Daniels admitted his involvement in the string of convenience store armed robberies. Significantly, there is no indication that once the interrogation became custodial, Daniels's statements were involuntary or that the conditions under which he made the statements were unconstitutionally coercive.

Although Daniels correctly notes Detective Lent failed to execute the standard written advisement of *Miranda* rights, the warnings are clear on the interview audio, and nothing suggests Daniels either misunderstood or did not hear the advisement. We acknowledge Daniels gave no audible assent during Detective Lent's recounting of the *Miranda* rights; however, immediately following the advisement when Lent asked Daniels if he had any questions about those rights and whether Daniels had been at work and had not been drinking, Daniels responded verbally. The tone of the remainder of the interview is conversational, the whole interview lasted approximately an hour and a half, and Daniels was neither threatened nor deprived of food, drink, or sleep. Notably, Daniels told the officers he wanted to come forward earlier, but he was scared of Brother and could not let anything happen to his family.

_____

[9] This was a dangerous gamble, but under the unique circumstances of this case, the tactics here did not cross the constitutional line.

The following day at the jail, Detective Lent re-advised Daniels of his *Miranda* rights, and Daniels again agreed to speak with him. This nineteen-minute interview was also audio-recorded, and—as with the evening interview at the precinct—evidence supports the circuit court's finding that Daniels's statements were knowingly and voluntarily made.

**Conclusion**

For the foregoing reasons, Daniels's convictions for armed robbery and murder are

**AFFIRMED.**

**KONDUROS J., concurs.**

**GEATHERS, J., concurring in result in a separate opinion.**

**GEATHERS, J.:** I concur with the majority's conclusion that *Seibert* did not require the exclusion of the statements given by Daniels after Detective Lent provided *Miranda* warnings to him. To be sure, Detective Lent elicited some incriminating admissions from Daniels during the first round of questioning. However, the second and third rounds produced much more information about the crime spree, including Daniels's damning confession that he saw Jenkins carrying a cash drawer at the end of the first robbery, indicating Daniels's knowing participation from that point forward, if not before. Because Daniels's statements in the second and third rounds constituted much more than a mere product of the first round, I do not believe a new trial is warranted. I merely point out that the statement given by Daniels prior to receiving *Miranda* warnings should have been excluded from evidence because it was the product of a custodial interrogation.[10]

Under all of the surrounding circumstances, a reasonable person would not have felt free to leave the office in which Detective Lent questioned Daniels.[11]

---

[10] *See Missouri v. Seibert*, 542 U.S. 600, 608 (2004) (holding that the failure to give *Miranda* warnings "before custodial questioning generally requires exclusion of any statements obtained").

[11] *See State v. Hill*, 425 S.C. 374, 381, 822 S.E.2d 344, 348 (Ct. App. 2018) (holding that in determining whether a person is in custody during a police interrogation, the court's "inquiry is objective, centering on whether one in [the suspect's] position would have believed he was free to stop the questioning and depart").

Daniels arrived home from work to find his pregnant girlfriend, LaShania Chestnut, speaking with officers while sitting in one of several unmarked police cars at the residence. When Detective Lent asked Daniels if he would be willing to speak with him at the police substation, Daniels agreed to do so. However, he was not allowed to drive his Grand Prix to the substation, despite the willingness to cooperate he showed by appearing at the residence soon after he was notified that officers were there questioning Chestnut. Rather, officers required Daniels and Chestnut to ride in separate police cars.[12] Once they arrived at the substation, Daniels and Chestnut were taken to separate offices. Detective Lent met with Daniels at approximately 9:45 p.m. and interviewed him for over thirty minutes before advising him of his *Miranda* rights.

Based on the foregoing, I believe the record contradicts the circuit court's finding that Daniels was not in custody.[13] Further, Detective Lent's questioning during this thirty-minute period was not only reasonably likely to an elicit incriminating response, it was specifically designed for this purpose.[14]

By "incriminating response[,]" we refer to *any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial*. As the Court observed in *Miranda*: "No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself *in any manner*; it does not distinguish degrees of incrimination."

*Rhode Island v. Innis*, 446 U.S. 291, 301 n.5 (1980) (emphases added) (quoting *Miranda v. Arizona*, 384 U.S. 436, 476 (1966)).

---

[12] *See id.* ("[I]f the 'invitation' [to the police station] is conditioned on the police escorting the defendant to the station, 'a finding of custody is much more likely.'" (quoting 2 LaFave, et al., *Criminal Procedure* § 6.6(d) (4th ed. 2017)).

[13] *See id.* at 380, 822 S.E.2d at 348 ("We review a trial court's custody ruling to determine if it is supported by the record.").

[14] *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (footnote omitted)).

Detective Lent started his questioning by asking Daniels if he had any idea why officers had asked him to talk with them. When Daniels said he had no idea, Detective Lent expressed incredulity and then explained that he was interested in Chestnut's car and Daniels's own car. From his earlier discussions with Chestnut, Detective Lent already knew that Daniels had access to Chestnut's car in January 2015. Detective Lent was also aware prior to his interview with Daniels that Chestnut's car matched the car in the surveillance videos. Therefore, at the very least, Detective Lent should have known that questioning Daniels about Chestnut's car and Daniels's own car was reasonably likely to elicit an incriminating response, i.e., that around the time of the robberies in question, Daniels had access to a car matching the car in the surveillance video.

Next, to nail down the precise days that Daniels was available to participate in the robberies, Detective Lent questioned Daniels about his work schedule during January 2015 and asked him to mark a desk calendar to indicate which days he had worked. Not only should Detective Lent have known that these questions were likely to elicit an incriminating response—i.e., Daniels had no workplace alibi and was available to participate in the robberies—he was counting on it. Detective Lent testified,

[O]ne of the first things I wanted to find out was if he had access to the car, if he was even in the area or around, or [would have] been able to have been free on the dates when these crimes had been committed. So, we start speaking about some things, some of which were his work schedule and times that he would work.

Detective Lent then questioned Daniels concerning his whereabouts and conduct on the day of the armed robbery and murder at the Sunhouse #1. Detective Lent already knew from the surveillance video that Daniels bought a soda in the store prior to the robbery. Therefore, Detective Lent would have known that the questions about Daniels's whereabouts on the day in question were likely to elicit an incriminating response, i.e., that, consistent with the activity of a scout, Daniels bought a soda at the Sunhouse #1 just prior to the robbery. Yet, it was not until after Daniels made this admission that Detective Lent advised Daniels of his *Miranda* rights.

In sum, I believe Daniels's first statement should have been excluded from evidence. Nonetheless, I do not believe a new trial is warranted because Daniels's statements in the second and third rounds of questioning constituted much more than a mere product of the first round.